IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 14–cv–00994–KMT

HOTTINGER EXCAVATING & READY MIX, LLC,

 Plaintiff,

v.

R.E. CRAWFORD CONSTRUCTION, LLC,
JEFF USELTON,
COASTAL ELITE, LLC,
PAUL JOHNSTON, SR.,
PAUL JOHNSTON, III,
EDGAR W. COX, JR., and
AKRON FDS, LLC,

 Defendants.

---

# ORDER

---

This matter is before the court on "Defendants R.E. Crawford Construction, LLC's and Jeff Uselton's Motion for Summary Judgment" (Doc. No. 71), to which Plaintiff has responded (Doc. No. 73) and Defendants have replied. (Doc. No. 75.) Also before the court is "Plaintiff's Motion for Summary Judgment" (Doc. No. 72), to which Defendants have responded (Doc. No. 74) and Plaintiff has replied. (Doc. No. 76.)

## STATEMENT OF FACTS

In 2012, Akron Family Dollar Store, LLC ("Akron FDS") hired independent contractor, Defendant R.E. Crawford Construction LLC ("Crawford" or "Crawford Construction"), to

construct a Family Dollar Store in Akron, Colorado (the "Project"). (Doc. Nos. 71-1, 71-2, 71-3.) Crawford Construction received total disbursements from Akron FDS in the amount of $523,249 for the Project. (Doc. No. 74-2 at 124.) Jeff Smith of Crawford Construction testified that these disbursements were handled consistent with his general practice of maintaining an accounting sheet, or escrow sheet, which lists all of Crawford Construction's active projects. (Doc. No. 72-4 at 36-37.) Within each project, Mr. Smith keeps an accounting of moneys paid in and out. (*Id.*) The money received for each project is held in escrow in this manner until it becomes due to the vendors. (Doc. No. 72-4 at 36-37; Doc. No. 77-2 at 2-3; Doc. No. 77-3.)

In or around April 2012, Crawford Construction hired various subcontractors for the Project, including Defendant Coastal Elite, LLC ("Coastal Elite"). (Doc. No. 71-4; Doc. No. 72-2 at 1.) Coastal Elite was hired to complete the building erection and under the terms of the original contract, Crawford Construction was to pay Coastal Elite $126,000. (Doc. No. 71-4 at 8-9.) On May 25, 2012, the contract was increased to $152,000. (Doc. No. 71-8.)

Coastal Elite hired various subcontractors, including Plaintiff. (Doc. No. 72-2 at 1; Doc. No. 74-1 at 11-12.) Coastal Elite and Plaintiff did not enter into a written contract at any point but instead relied on four verbal agreements. (Doc. No. 71-6 at 2-3.) First, Coastal Elite hired Plaintiff to erect the building for the Project, for which Coastal Elite was supposed to pay Plaintiff $18,800. (Doc. No. 71-5 at 27-28; Doc. No. 71-6 at 2-3.) Second, Coastal Elite asked Plaintiff to do the "dirt work" for the job, which included digging the foundation for the building, hauling in filling material, spreading it in layers and compacting it. (Doc. No. 71-5 at 19.) Coastal Elite was supposed to pay Plaintiff only its employees' hourly rate plus the cost of equipment and other items needed for the project. (*Id.*) Third, Plaintiff agreed to finish grading

the parking lot. (Doc. No. 71-5 at 124.) Finally, Plaintiff agreed to do work related to curbs and sidewalks. (Doc. No. 71-5 at 85-88.)

On July 17, 2012, Coastal Elite submitted draw paperwork to Crawford Construction, along with a Sworn Statement indicating the total amounts owed to Coastal Elite's subcontractors and the supporting documentation. (Doc. No. 71-9.) The Sworn Statement indicated Coastal Elite owed $147,176.35 to its subcontractors, even though the total contract with Crawford Construction was $152,000. (Doc. No. 71-8; Doc. No. 71-9 at 6.) It also indicated Coastal Elite had not paid any funds to any of its subcontractors and that Plaintiff's work on the Project was 100% complete. (Doc. No. 71-9 at 6.) Crawford Construction became concerned by the small difference between Coastal Elite's total contract and the total amount due to its subcontractors, as well as by the fact that no funds had been paid out. (Doc. No. 74-2 at 101-02.) Based on this, Crawford decided to pay Coastal Elite's subcontractors directly. (*Id.*)

On July 18, 2012, Crawford Construction requested various additional paperwork from Coastal Elite and noted that the balance of submitted invoices from Plaintiff totaled only $36,983.19, yet Coastal Elite had stated on its Sworn Statement it owed Plaintiff $49,816.15, a difference of $12,832.96. (Doc. No. 71-10.) Ed Cox, Coastal Elite's Vice President, contacted Eugene Hottinger, Plaintiff's owner, and instructed him to create an invoice in the amount of $12,832.96 with a work description of "additional site work" because that was the amount left on the contract. (Doc. No. 71-5 at 138-39.) Plaintiff created Invoice # 8739 in this manner. (Doc. No. 71-5 at 138-39; Doc. No. 71-12.)

On July 19, 2012, Coastal Elite submitted Plaintiff's Invoice # 8739 to Crawford Construction stating, "Sorry I left this one out." (Doc. No. 71-10.) The invoice raised red flags

for Crawford as it noted that the invoice totaled $12,832.96, the exact amount of the previously referenced discrepancy, and was dated the day after Crawford was informed Plaintiff's work was completed. (Doc. No. 71-9 at 14-19; Doc. No. 71-10; Doc. No. 71-12.) Crawford was also concerned by the invoice because it was not aware of any "additional site work" that needed to be completed at that time. (Doc. No. 75-1 at 68-69, 97-98, 104.) On August 7, 2012, Crawford Construction issued a check to Plaintiff in the amount of $36,983.19, the total amount of the invoices submitted by Plaintiff, with the exception of Invoice # 8739 for which Crawford Construction requested further information from Coastal Elite. (Doc. No. 72-2; Doc. No. 74-2 at 85-88; Doc. No. 75-1 at 100, 104-05.)

On August 17, 2012, Plaintiff submitted additional invoices totaling $37,675.92 directly to Crawford Construction, including Invoice # 8695 dated June 20, 2012, Invoice # 8744 dated July 25, 2012, Invoice # 8745 dated July 25, 2012, and Invoice # 8747 dated July 25, 2012, with a statement that these invoices had not been paid by Coastal Elite and requesting payment from Crawford Construction. (Doc. No. 71-11 at 2-6.) The four invoices arriving in August considerably heightened Crawford's concern. (Doc. No. 71-11; Doc. No. 74-2 at 68-69, 84-88, 101-02, 104; Doc. No. 75-1 at 100-02.) Crawford noted that one of the four invoices was dated June 20, 2012, over one month prior to the submission of Plaintiff's original invoices, while three were dated one week after Coastal Elite told Crawford that Plaintiff's work was completed. (Doc. No. 71-11; Doc. No. 75-1 at 68-69, 102.) Crawford also noted the fact that #8739, which remained outstanding, was not included in the new invoices and total demanded. (Doc. No. 71-11; Doc. No. 75-1 at 68-69, 97-99, 102, 105.)

When Crawford received the new invoices, it continued to hold $12,832.96 in trust to pay Invoice #8739, presuming it eventually received the additional information it requested regarding the same. (Doc. No. 75-1 at 83-84, 85; Doc. No. 77-2; Doc. No. 77-3.) It also requested further information pertaining to the new invoices. Though it is not clear exactly when this request took place, Plaintiff has stated that, in response to Crawford's request for more information, it submitted Daily Job Reports in support of its invoices "well before the lawsuit at issue was filed." (Doc. No. 73 at 15.) However, Crawford Construction found, and Mr. Hottinger admitted, a number of inconsistencies between the Daily Job Reports and Plaintiff's invoices. (Doc. No. 71-5 at 101-03, 106-07, 112, 114-17.)

For example, with regard to Invoice # 8745, Mr. Hottinger initially testified that the invoice pertained to work performed on June 13, 2012, even though the invoice is dated July 25, 2012. (Doc. No. 71-5 at 107.) This invoice included a work description of "labor and equipment use to fill and grade parking lot," "labor," and "installing water and sewer lines." (Doc. No. 71-18 at 4.) Plaintiff's Daily Job Report from June 13, 2012 contains the description "Remove asphalt and concrete." (Doc. No. 71-5 at 106.)[1] Plaintiff acknowledged that a third party would have no way of knowing that the work described in the June 13, 2012 Daily Job Report was encompassed within Invoice # 8745, dated July 25, 2012. (Doc. No. 71-5 at 106-11.) Specifically, Mr. Hottinger explained, "Well, there is nothing in that invoice that tells you that. I just - - I know in my mind that that's what it is." (Doc. No. 71-5 at 110.)

---

[1] Defendant indicated in its Motion to Dismiss that Exhibits L and M reflect Plaintiff's Daily Job Report. (Doc. No. 71 at 20.) However, Exhibit L is the Sworn Statement from Coastal Elite submitted to Crawford Construction with its draw paperwork and Exhibit M is an excerpt from the deposition of Jeff Uselton. (Doc. No. 71-14; Doc. No. 71-15.) Fortunately, the content of the Daily Job Report at issued was reflected in Mr. Hottinger's deposition.

Additionally, the amounts indicated in the invoice were flat rates rather than certain amounts owed for hours worked. (Doc. No. 71-13.) For example, it provided that the amount owed for "labor and equipment use to fill and grade parking lot" was "12,000" at a rate of "12,000." (*Id.*) Mr. Hottinger later admitted that Mr. Cox called him a few days before July 25, 2012 (the date of Invoice # 8745) and told him that Coastal Elite had $16,500 left on the contract with Crawford Construction for Plaintiff to bill out. (Doc. No. 71-5 at 161-62.) Thus, the amount owed as reflected on Invoice # 8745 does not represent hours worked or costs expended. (*Id.*)[2]

Plaintiff claims that the total amount of the invoices it submitted to Crawford Construction was $74,659.11 (this total does not include the $12,832.96 from #8739, but does include the $16,500 from #8745), however, Crawford has only paid $36,983.19. (Doc. No. 72-2 at 2.)[3] Plaintiff filed a mechanic's lien with the Washington County Clerk & Recorder on October 10, 2012 in the amount of $37,675.92, the total of the invoices submitted in August and the amount Plaintiff contends represents the value of the services it provided for the Project. (Doc. No. 72-2 at 2, 26.)

In the present case, certain of Plaintiff's claims were previously dismissed by this court. (Doc. No. 47.) Plaintiff's remaining claims against Crawford Construction are based upon civil theft, breach of fiduciary duty, breach of contract, and unjust enrichment. Plaintiff also asserted claims against Defendant Uselton for civil theft and breach of fiduciary duty. Defendants initially moved for summary judgment on all of Plaintiff's remaining claims, but have conceded

---

[2] Mr. Hottinger reiterated this sequence of events in his Affidavit submitted in support of his Response to Defendant's Motion for Summary Judgment. (Doc. No. 73-4 at 2.)
[3] At some point, Plaintiff voided Invoice #8739, though Mr. Hottinger did not inform anyone of this until his deposition taken during this lawsuit. (Doc. No. 71-5 at 145-52.)

that Plaintiff's unjust enrichment claim is not appropriate for summary judgment.[4] (Doc. No. 75 at 14.) Plaintiff has requested summary judgment as to its claim for civil theft or, in the alternative, its claim for unjust enrichment.[5]

## STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

---

[4] Plaintiff has conceded summary judgment to Defendant Uselton. (Doc. No. 73 at 1.)
[5] On February 13, 2015, the court entered default judgment in favor of Plaintiff on its claims against Akron FDS, LLC, Coastal Elite, LLC, Paul Johnston and Paul C. Johnston. (Doc. No. 58.)

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

## ANALYSIS

**1. Civil Theft**

Plaintiff has asserted a claim of civil theft against Crawford Construction based upon Colo. Rev. Stat. § 38-22-127, commonly referred to as the Trust Fund Statute ("TFS"). The statute provides, in relevant part:

> (1) All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor, who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.
>
> (2) This section shall not be construed so as to require any such contractor or subcontractor to hold in trust any funds which have been disbursed to him or her for any subcontractor, laborer or material supplier, or laborer who claims a lien against the property or claims against a principal and surety who has furnished a bond under the provisions of this article if such contractor or subcontractor has a

> good faith belief that such lien or claim is not valid or if such contractor or subcontractor, in good faith, claims a setoff, to the extent of such setoff.
>
> * * *
>
> (4) Every contractor or subcontractor shall maintain separate records of account for each project or contract, but nothing contained in this section shall be construed as requiring a contractor or subcontractor to deposit trust funds from a single project in a separate bank account solely for that project so long as trust funds are not expended in a manner prohibited by this section.
>
> (5) Any person who violates the provisions of subsections (1) and (2) of this section commits theft, as defined in section 18-4-401, C.R.S.

*Id.* Thus, in order to sustain its claim for civil theft, Plaintiff must show that Crawford Construction violated the TFS. *Id.*

Plaintiff first contends that Crawford Construction violated this statute because it failed to hold the funds it received from Akron FDS in trust. In asserting this argument, Plaintiff relies on the deposition testimony of Mr. Smith in which he stated that Crawford Construction does not hold funds for their projects in separate, independent bank accounts. (Doc. No. 72-4 at 37.) Plaintiff is apparently under the impression that § 38-22-127(1) requires a contractor to hold funds for each of its construction projects in individual trust accounts. However, Plaintiff's interpretation directly conflicts with the fourth provision of the TFS, specifically providing that nothing contained within the TFS requires a contractor to hold funds in separate bank accounts. Colo. Rev. Stat. § 38-22-127(4).

Moreover, Colorado courts have rejected Plaintiff's urged application of the TFS. In *People v. Collie*, 682 P.2d 1208 (Colo. App. 1983), the defendant, a construction contractor, appealed his conviction for criminal theft. *Id.* at 1210. One of the issues raised on appeal was a challenge to a jury instruction that summarized § 38-22-127, providing:

9

> The law requires that funds disbursed to a contractor under a building, construction or remodeling contract be held in trust for the payment of subcontractors, material suppliers, or laborers who have furnished materials, services or labor, or who have a lien or may have a lien against the property.
>
> A contractor is not required to deposit such funds from a single project into a separate bank account solely for that project, so long as these funds are not expended as prohibited above.

*Id.* at 1211. The court denied the defendant's challenge to the instruction, holding that the "instruction was properly admitted" and "stated the law correctly." *Id.*

As previously noted, Mr. Smith testified that Crawford Construction maintains a separate accounting sheet for each of its projects and that it did the same for the Akron FDS project. (Doc. No. 72-4 at 36-37.) Additional records submitted by Crawford Construction also support Mr. Smith's testimony in this regard. (Doc. No. 72-4 at 36-37; Doc. No. 77-2 at 2-3; Doc. No. 77-3.)

Beyond this alleged *per se* violation, the parties also disagree on whether a contractor has to hold the entirety of the funds disbursed to it for a construction project until the project is completed, or whether it is enough that the contractor holds the amount of each individual contract. The court finds, however, that it is not necessary to resolve this issue as Crawford Construction has asserted a defense to Plaintiff's TFS claim under Colo. Rev. Stat. § 38-22-127(2), the TFS's safe harbor provision. As set forth above, it provides that a contractor is not required to hold funds in trust for a subcontractor if the contractor has a good faith belief that the subcontractor's lien or claim is not valid. *Id.*

The TFS does not define what constitutes "good faith" but both parties agree that the standard discussed in *In re Mayhew*, No. 08–10628 HRT, 2014 WL 813064 (Bankr. D. Colo. Feb. 28, 2014) is appropriate. The *Mayhew* court considered the TFS's safe harbor provision and

noted, "The parties have not cited, nor has this Court's research located, any case law setting forth the required standards for a finding of 'good faith' under this subsection. The Court assumes, without deciding, that good faith includes both subjective and objective components." *Id.* at *5.

It is undisputed that Crawford held $12,892.96 in trust for outstanding invoice #8739, fulfilling its statutory duty under the TFS at that time. (Doc. No. 71-5 at 145-52; Doc. No. 77-2 at 1-3; Doc. No. 77-3.) Thus, the relevant question is whether Crawford Construction had a good faith belief that the invoices submitted in August were not valid.

With regard to the subjective component of good faith and as set forth in more detail above, Crawford Construction testified, through Mr. Smith, that red flags had already been raised concerning Plaintiff's invoices when Coastal Elite submitted Invoice #8739 due to the total, the work description and the date. (Doc. No. 71-9 at 14-19; Doc. No. 71-12; Doc. No. 74-2 at 85; Doc. No. 75-1 at 83, 97-98, 100-02, 104.) The four invoices arriving in August worked to heighten Crawford's concern. (Doc. No. 71-11; Doc. No. 74-2 at 68-69, 84-88, 101-02, 104; Doc. No. 75-1 at 100-02.) The invoices almost doubled the amount purportedly owed to Plaintiff, in spite of the fact Crawford had been informed Plaintiff's work was already complete. (Doc. No. 71-11; Doc. No. 75-1 at 68-69, 102.) Additionally, they were purportedly for work performed prior to Crawford's previous payment and after Plaintiff was supposed to be finished. (*Id.*) At that time, Crawford also noted the fact that # 8739, which was still outstanding, was not included in the new total demanded and Crawford was not aware Plaintiff had unilaterally voided the same. (Doc. No. 71-11; Doc. No. 75-1 at 68-69, 97-99, 102, 105.) Further, requesting additional information to verify and/or explain the work reflected in the invoices further

11

deteriorated Crawford's confidence that the invoices were legitimate as the Daily Job Reports were inconsistent with the invoices. (Doc. No. 71-5 at 101-03, 106-07, 112, 114-17; Doc. No. 73 at 15.)

The court finds that the evidence presented by Crawford, including the records pertaining to the Project and deposition testimony on behalf of Crawford, establishes that Crawford had a subjectively good faith belief that the balance of Plaintiff's claim was not valid.

As to the objective component, whether Crawford's belief was reasonable, the court has considered not only testimony and evidence presented on behalf of Crawford but also on behalf of Plaintiff. Plaintiff's only substantive response to Crawford's defense under the TFS's safe harbor provision is its contention that if Crawford had merely asked Plaintiff to substantiate its work, it would have been able to do so and since it purportedly did not, it could not have acted in good faith. (Doc. No. 72 at 7; Doc. No. 73 at 15-16.) However, this directly contradicts not only the evidence of record but Plaintiff's own asserted positions within the summary judgment briefing. As noted, Plaintiff stated specifically that it provided its Daily Job Reports, at the request of Crawford's counsel, "well before this lawsuit was filed." (Doc. No. 73 at 15.) Thus, Crawford did request further information from Plaintiff and the record shows that the Daily Job Reports submitted in response do very little to substantiate Plaintiff's invoices.

Mr. Hottinger admitted Plaintiff's invoices were confusing, often inconsistent with its Daily Job Reports, and that they did not indicate labor being performed or hours being worked. (Doc. No. 71-5 at 101-03, 106-07, 112, 114-17.)[6] As set forth in more detail in the Statement of Facts above, at least one of the invoices, totaling $16,500, was not based on actual work

---

[6] Plaintiff testified that it has since changed its practices in certain aspects with respect to invoicing and daily job reports. (Doc. No. 71-5 at 117-18.)

performed but instead on a statement from Coastal Elite that $16,500 was left to pay out on the contract. (Doc. No. 71-5 at 105-07, 110-11; Doc. No. 71-13.)

The court notes that generally the element of good faith presents a fact question for the jury. However, the Tenth Circuit has recognized that where evidence of good faith is uncontroverted, it can be the proper basis for judgment as a matter of law. *See Meyers v. Ideal Basic Indus., Inc.*, 940 F.2d 1379, 1386 (10th Cir. 1991) (upholding a trial court's granting of a motion judgment notwithstanding the verdict, holding that the evidence so strongly supported a good faith reliance on the part of the defendant that "reasonable minds could not differ on this issue."). Based on the record, the court finds Plaintiff has not established a question of fact as to the objective reasonableness of Crawford Construction's good faith belief that its claims were not valid.

Pursuant to the TFS's safe harbor provision, Crawford Construction has not violated the requirements of the TFS. Accordingly, the court finds that Crawford Construction is entitled to summary judgment against Plaintiff's civil theft claim.

**2. Breach of Fiduciary Duty**

Plaintiff asserted a claim against Crawford Construction for breach of fiduciary duty based on its contention that pursuant to the TFS, Crawford was under a fiduciary duty to hold funds in trust and account for the distribution of the same. In light of this court's determination that Crawford Construction was not under a duty to hold additional funds in trust, it could not have breached a fiduciary duty between the parties. Thus, Plaintiff's claim based on breach of fiduciary duty cannot stand.

### 3. Breach of Contract

In order to establish breach of contract under Colorado law, Plaintiff must prove: "(i) the existence of a binding agreement; (ii) the plaintiff's performance of its obligations (or some justification for its non-performance); (iii) the defendant's failure to perform its obligations; and (iv) resulting damages." *Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA), Inc.*, 958 F. Supp. 2d 1238, 1243 (D. Colo. 2013) (citing *W Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)). Plaintiff contends it had two contracts with Crawford Construction and that Crawford's refusal to pay Plaintiff additional funds constitutes a breach of both.

In its Response to Defendant's Motion for Summary Judgment, Plaintiff claims the first contract occurred late in the Project when Richard DeGrace, a Crawford employee, and Mr. Cox of Coastal Elite requested Plaintiff "perform the grading of the parking lot, among other tasks, for the Project for payment under the same terms as the 'dirt work.'" (Doc. No. 73 at 17.) This assertion is supported by Mr. Hottinger's Affidavit submitted with Plaintiff's Response. (Doc. No. 73-4 at 2).

Plaintiff never indicated in its Complaint that anyone from Crawford Construction directly asked it to perform any work on the Project. To the contrary, Plaintiff states only that Mr. Cox asked Plaintiff to perform various jobs. (Doc. No. 43 at 2-3.) Further, in its discovery requests, Defendant asked Plaintiff to identify each agreement related to the Project. (Doc. No. 71-6 at 2.) Plaintiff identified four agreements, including, in relevant part:

iii. Agreement for Hottinger to finish grading the property.

1. Cox asked and hired Hottinger to finish grading the property. Hottinger agreed to finish grading the property for the cost of materials and the time of labor.

2. When: On or about June 2012.

14

      3. Person(s) who made agreement with Plaintiff:

         a. Ed Cox, Operating Manager and Registered Agent

(Doc. No. 71-6 at 3-4.)  Plaintiff never mentions Mr. DeGrace, nor anyone else from Crawford Construction, being involved in this agreement until Mr. Hottinger's Affidavit submitted with his Response to Defendant's Motion for Summary Judgment.  Clearly, the Affidavit conflicts with Plaintiff's sworn Interrogatory Responses.  (Doc. No. 71-6 at 3-4; Doc. No. 73-4 at 2.)

      More significant, however, Plaintiff has not presented any evidence that it performed the work in question, implicating the second element of a breach of contract claim.  The only invoice that includes any reference to this work is Invoice # 8744, dated July 25, 2012, which specifically includes the work description, "labor and equipment use [sic] to fill and grade parking lot."  (Doc. No. 71-13.)  However, as discussed above, Plaintiff, through Mr. Hottinger, has admitted this Invoice is not a valid reflection of work performed on any specific date.  Instead, Mr. Hottinger simply created an Invoice totaling $16,500 because Mr. Cox notified him that was the amount of money left to pay out on the contract between Coastal Elite and Crawford Construction.  *See supra.*  Thus, Plaintiff has not established that a question of fact exists as to the first two elements of this breach of contract claim, *i.e.*, the existence of this particular contract and performance by Plaintiff.

      Plaintiff also contends that a second contract exists based on Crawford Construction's decision to pay Coastal Elite's subcontractors directly.  According to Plaintiff, by paying Coastal Elite's subcontractors directly, "Crawford acknowledged responsibility for and assumed the contract between Coastal Elite and Coastal Elite's subcontractors and material suppliers, thereby creating a new, direct contract between Crawford, on one hand, and Coastal Elite's

15

subcontractors and material suppliers, on the other hand." (Doc. No. 73 at 17.) Plaintiff does not cite any law supporting this position.

To prevail on a claim for breach of an oral contract, Plaintiff must "prove all the elements of the formation and breach of [that] contract." *Tuttle v. ANR Freight Sys., Inc.*, 797 P.2d 825, 827 (Colo. App. 1990) (citing *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708 (Colo. 1987). Here, Plaintiff has not established the existence of a contract with Crawford and has not set forth any law establishing that Crawford "assumed the contract" between Coastal Elite and Plaintiff merely because it paid Coastal Elite's subcontractors directly. Thus, Crawford Construction is entitled to judgment as a matter of law against this claim.

### 4. Unjust Enrichment

Finally, Plaintiff has requested summary judgment on its unjust enrichment claim as an alternative to its civil theft claim under the TFS.

> Unjust enrichment is a form of quasi-contract or a contract implied in law. As such, it is an equitable remedy and does not depend on any contract, oral or written. The theory does not require any promise or privity between the parties. Rather, it is a judicially created remedy designed to avoid benefit to one to the unfair detriment of another.

*Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000) (internal citations omitted). The elements of an unjust enrichment claim require Plaintiff to prove: "(1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Id.* at 1265-66 (citing *DCB Constr. Co. v. Central City Dev. Co.*, 965 P.2d 115, 119–20 (Colo. 1998)).

In its Motion, Plaintiff states summary judgment is appropriate because "Crawford believes that Hottinger performed the work set forth in its invoices, has no knowledge of any

16

problems with Hottinger's work and has no idea whether or not Hottinger overcharged for the work that it performed, . . . ." (Doc. No. 72.) Plaintiff does not cite to any portion of the record supporting this statement, and in fact, the record directly contradicts it as Crawford testified, *via* Mr. Smith, that it believes the value of Plaintiff's work was less than the amount it charged. (Doc. No. 74-2 at 78.)

Further, Plaintiff contends its services were worth an additional $37,675.92, the total amount reflected in its invoices submitted to Crawford Construction in August 2012. (Doc. No. 72-2.) However, as discussed *supra*, Plaintiff has already admitted that one of those invoices was not based on specific work performed but created solely to match an amount Coastal Elite told Plaintiff was left to pay out on the contract. Additionally, inconsistencies between Plaintiff's Daily Job Reports and its invoices have also been established. Thus, the reasonable value of Plaintiff's services is in dispute, making this claim improper for summary judgment. *See, cf., Fischer Imaging Corp. v. General Elec. Co.*, 187 F.3d 1165, 1172-73 (10th Cir. 1999) ("Generally, in quasi-contract actions courts have submitted the question of the value of the goods or services to the jury.")

Accordingly, it is

**ORDERED** that "Defendants R.E. Crawford Construction, LLC's and Jeff Uselton's Motion for Summary Judgment" (Doc. No. 71) is **GRANTED in part** and **DENIED in part**. Defendants' Motion is granted as to all of Plaintiff's claims against Defendant Uselton and Plaintiff's claims against Crawford Construction for civil theft, breach of fiduciary duty and breach of contract, and denied as to Plaintiff's claim of unjust enrichment. It is also

**ORDERED** that "Plaintiff's Motion for Summary Judgment" (Doc. No. 72) is **DENIED**.

Dated this 30th day of March, 2016.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge